ANNA D. KELLER, Appellant, v. LEWIS COUNTY: DAVID G. LILLARD; HENRY FORSTHOVE and EMMET C. NUNN, Judges of the County Court of Lewis County, and THOMAS I. JOHNSON, Executor under the Will of LUCIUS D. PATTERSON.—134 S. W. (2d) 48.

Division One, December 13, 1939.

*Walter M. Hilbert, Otto P. Shanks* and *Wilson & Schmiedeskamp* for appellant.

*Barker Davis, H. S. Rouse, W. A. Mussetter* and *Noah W. Simpson* for respondents.

BRADLEY, C.—Plaintiff sought a decree adjuding her to have the status of an adopted daughter of Lucius D. Patterson, deceased, and that the property owned by deceased, at the time of his death and disposed of by his last will, be adjudged to be the property of plaintiff. The Pattersons were childless, and Mrs. Patterson predeceased her husband. Mr. Patterson executed his last will May 23, 1928, by which his entire estate, consisting of cash and U. S. bonds, amounting in all to $25,026.84, was bequeathed to Lewis County "for the use of the Lewis County, Missouri Infirmary for the support of the poor and dependent therein and for no other purpose whatever." Testator died May 28, 1936, and the will was admitted to probate on June 1, 1936. This cause was filed March 26, 1937. The court found against plaintiff and dismissed her petition. Unsuccessful in motion for a new trial she appealed.

Plaintiff, in her petition, states that "on or about the 8th day of April, 1872, Lucius Desha Patterson took plaintiff from said institution (orphans' home), no children having been born to the said Lucius Desha Patterson and his wife, both of whom later died childless; that immediately upon taking plaintiff from said institution in the city of Quincy, Illinois, as aforesaid, the said Lucius Desha Patterson and his wife brought plaintiff to their home in Lewis County, Missouri, as their daughter and assumed her care, custody and control; that on or about the last day of May, 1872, in the County of Lewis, State of Missouri, the said Lucius Desha Patterson orally agreed with the said plaintiff to adopt her as his child and heir; that they gave to plaintiff the name of Anna D. Patterson, and sent her to school; that plaintiff was introduced and referred to thereafter by the said Lucius Desha Patterson and his wife as their adopted daughter and that they stated upon various occasions that they had agreed to adopt plaintiff as their daughter and were going to adopt her as their daughter; that during the time that plaintiff remained in the home of the said Lucius Desha Patterson and his wife she rendered such obedience and service and the affection and attention as is usually rendered to parents by a child; that thereafter on the 5th day of September, 1888, plaintiff was married at the home of the said Lucius D. Patterson and under the name of Anna D. Patterson with the advice and consent of the said Lucius D. Patterson. . . . That plaintiff fully performed all her duties as the adopted daughter

of the said Lucius Desha Patterson and lived with and served him as such for a period of more than twenty years and until long past her age of maturity, but that the said Lucius Desha Patterson failed and neglected to execute the necessary instrument evidencing a legal adoption of plaintiff.'' Defendants answered jointly by a general denial.

The facts follow: Anna Elizabeth Draper (plaintiff) was born at Marceline, Illinois, February 6, 1865, and on August 14, 1871, she was placed by her mother in the Woodland Home for Orphans and Friendless at Quincy, Illinois. April 8, 1872, she was taken from the orphans' home by Lucius D. Patterson, who, with his wife, resided in Lewis County, Missouri. The Pattersons, for some reason, soon returned plaintiff to the orphans' home, but she was again taken from the home by Mr. Patterson under what is termed an apprenticeship indenture, executed by him and the orphans' home on June 6, 1872.

Plaintiff remained in the Patterson home from June 6, 1872, until her marriage to Edward G. Keller September 5, 1888. In December, 1896, she separated from her husband, and she and the children, three boys—age seven, six, and four years, went to the Patterson home. January 12, 1897, she filed suit in Marion County, Missouri, for divorce, alleging certain indignities. September 11, 1897, she was granted a divorce and custody of the children. It is not clear just how long plaintiff and her children remained in the Patterson home, but probably until some time in 1898, when plaintiff and her husband were remarried. Mr. Patterson was strongly opposed to plaintiff returning to and remarrying her former husband, and endeavored to dissuade her from doing so. After the remarriage, insofar as appears here, communication between plaintiff and her family, and the Pattersons practically ceased. The Kellers left the State in 1915 or 1916, and thereafter there was no communication, so far as appears. The three sons were witnesses. Two resided in Idaho, and one in the State of Washington. It does not appear where plaintiff resided. The trial court filed a written opinion in which he says that plaintiff ''came from somewhere'' after the death of Mr. Patterson.

We have given a kind of skeleton background of plaintiff's connection with the Pattersons. Fourteen witnesses, men and women, who knew plaintiff when she was in the Patterson home, were witnesses for her. A composite statement of the evidence of these witnesses may be given thus:

The Pattersons treated plaintiff as their daughter and she treated them as her father and mother; addressed them as ''ma'' and ''pa,'' and when speaking of them so designated them. There was that affection that usually obtains between parents and child. The Pattersons, both at home and abroad, held plaintiff out as their daughter; fed her; clothed her; schooled her; loved her. In brief, the Patter-

sons did all that could be expected of fairly well to do parents, and plaintiff responded as a dutiful and appreciative daughter would be expected to do.

The Pattersons sent out formal invitations to plaintiff's wedding, which invitations read: "Mr. and Mrs. L. D. Patterson desire your presence at the marriage of their daughter, Anna, to Edward G. Keller, Wednesday evening, September fifth, eighteen hundred and eight-eight, at 6:30 o'clock." The marriage license authorized the marriage of "Edward G. Keller in the County of Marion and State of Missouri, who is over the age of twenty-one years, and Miss Anna D. Patterson of the County of Lewis and State of Missouri, who is over the age of eighteen years."

Eugene Nelson, an attorney and ex-speaker of the Missouri House of Representatives, and one of the fourteen witnesses above mentioned, in his boyhood years knew the Pattersons and plaintiff. He testified that the Patterson family and the Nelson family "visited quite frequently;" that "as early as 1880" he heard his father and Mr. Patterson discuss the subject of getting plaintiff out of the orphans' home, "and my father said to him, 'why she (plaintiff) won't inherit your property,' and that Mr. Patterson said, 'I fixed it so she will as my child.'" Mr. Nelson said that he "heard that gone over many times in the presence of my mother, my father and Mr. and Mrs. Patterson."

Edward, Frank and Lucius Keller, plaintiff's sons, were witnesses. Frank's middle name was Desha. The names Lucius and Desha were taken from the name of Mr. Patterson. These sons, in their childhood, were recognized generally as the grandsons of the Pattersons, and were so recognized and treated by the Pattersons.

Edward was between five and six years old when his mother and father remarried. Speaking of the occasion when his mother was leaving the Patterson home to return to and remarry Keller, Edward testified that Mr. Patterson, called grandfather by him, said to plaintiff:

"Well, Anna, if you have made up your mind to go back to Ed, the only thing you can do is go, but if you do, don't look for any more support from us, but why don't you take the children and give them back to the Kellers and you stay with us? . . . Why don't you take the boys and give them back to the Kellers and you stay with us. We took you and adopted you and raised you as our daughter and you will always have that protection as long as you stay with us, and if you stay with us you will never want for anything, but if you go back to Ed, you will just have to forget us because we are through." Edward testified that his mother said in reply: "I will take in washing or do anything before I will give those boys up."

Then speaking of an occasion when Edward was about eighteen or nineteen years old and when he and his brother Lucius were at

the Patterson home to see about borrowing some money, he testified as follows:

"The first thing he (Mr. Patterson) wanted to know, 'Are you boys to yourselves now? are you farming to yourself, or are you still mixed up, or does your father have any interest with you at all?'·and he says, 'now, the reason I am asking this, boys,' he says, 'now your mother, as you understand we raised her, adopted her and raised her as our daughter and we are always willing to help her and will help you boys, but we are going to see that Ed, your father, is not going to get any of our money to use in any way, shape or form, what I would like to know, is he interested in any way with you boys in this deal, or in your farming?' We told him that we was renting our land from our father. At that time he (their father) was running a clothing store at Camp Point, Illinois, and we and our mother was down there farming the land, and we told him we was farming the land and he was getting a share of the crop. He says, 'well, I am sorry, in that case I can't let you have the money.' "

There was a sale at the Patterson home about 1912, preparatory to the Pattersons moving to LaGrange. A few days before this sale, Edward and his mother had lunch at the Patterson home. Edward testified that on this occasion Mr. Patterson said: "I remember, Anna, when we came back from Quincy after you, when we got notice we could come and get you (the second time) we were so tickled that I said to Grandma, 'we will fix it this time so they can't take Anna away from us.' After I brought you back out here, do you remember when I asked you if you wanted to be our little girl for the rest of your life' and my mother says, 'yes, I remember that.' "

As to what Mr. Patterson said on the occasion when plaintiff returned to her husband, Frank testified about the same as Edward. Lucius testified about the same as Edward as to what Mr. Patterson said on the occasions when plaintiff returned to her husband, and when Edward and Lucius sought to borrow the money.

John Benson, a witness for plaintiff and one of the fourteen witnesses above referred to, testified that when he was about seven or eight years old he was present at the Patterson home; that his father, an attorney, and Mr. Scofield, an attorney, were there; that on this occasion, "something was said about her (plaintiff's) adoption." The record shows that F. L. Scofield prepared a will for Mr. Patterson, which will was executed August 4, 1880 (see infra), and Scofield was one of the attesting witnesses.

Defendants introduced the apprenticeship indenture (referred to, supra), the will of August 4, 1880, and the divorce petition filed by plaintiff. As above stated, the apprenticeship indenture was executed by Mr. Patterson and the orphans' home on June 6, 1872. This indenture recites that the home "has placed and by these presents does place and bind out as an apprentice, female, child, named Anna E.

Draper who is now of the age of seven & 1/3 years, to the said Lucius D. Patterson to learn the art, trade and mystery of housekeeping; to dwell with and serve the said Lucius D. Patterson from the day of the date hereof, until the sixth day of February, 1883, at which time the said apprentice will be eighteen years of age. During all of which time or term the said apprentice shall well and faithfully serve the said Lucius D. Patterson and all his lawful commands, at all times, readily and promptly obey.

"And the said Lucius D. Patterson binds himself to cause said apprentice to be taught reading, writing, arithmetic, geography, and English grammar; to furnish said apprentice with good, wholesome food, and decent and comfortable wearing apparel, and to treat her kindly and humanely, in sickness and health, during the said term of apprenticeship and at the expiration of said term, the said Lucius D. Patterson binds himself to give said apprentice a new Bible, and two new suits of clothes, suited to her condition in life, and to pay to said apprentice the sum of ————."

By the will of August 4, 1880, testator devised all his property to his wife, and did not mention plaintiff. The divorce petition filed by plaintiff January 12, 1897, referred to the Pattersons as "friends", and as "Mr. and Mrs. Patterson, two aged people who had raised her and cared for her." The divorce petition is the only instance, so far as appears here, where plaintiff referred to the Pattersons otherwise than as her father and mother.

In Benjamin v. Cronan, 338 Mo. 1177, 93 S. W. (2d) 975, l. c. 979, we said: "An oral agreement to adopt is within the Statute of Frauds (Wales v. Holden, 209 Mo. 552, 108 S. W. 89; Drake v. Drake, 328 Mo. 966, 43 S. W. (2d) 556; Kidd v. St. Louis Union Trust Co., 335 Mo. 1029, 74 S. W. (2d) 827, l. c. 831), but, notwithstanding the statutory law relative to adoption of children, a court of equity will take the necessary steps 'to protect the interest of a child in a case where one has expressly agreed to adopt the child, or by his acts and conduct has placed himself in a position where it would be inequitable to permit him to assert that the child was not adopted.' [Drake v. Drake, supra, 328 Mo. 966, 43 S. W. (2d) 556, l. c. 559.] The cases are numerous to this effect and none to the contrary. However, the rule is definite and strict as to the requirements respecting the character and quantum of proof necessary to establish an oral contract to adopt or to establish adoption on the theory of estoppel. This rule, as expressed in numerous cases, is that such evidence must be clear, cogent, and convincing and such as to leave no reasonable doubt. [Kay v. Niehaus, 298 Mo. 201, l. c. 205, 249 S. W. 625; Taylor v. Coberly, 327 Mo. 940, 38 S. W. (2d) 1055, l. c. 1060; Gipson v. Owens, 286 Mo. 33, l. c. 49, 226 S. W. 856; Ahren v. Matthews, 337 Mo. 362, 85 S. W. (2d) 377, l. c. 383.] The cases as to this rule are likewise numerous and none to the contrary."

■ The apprenticeship indenture certainly constitutes substantial evidence that Mr. Patterson did not, when he took plaintiff from the orphans' home, promise to adopt her, and that he did not then adopt her, and the will of August 4, 1880 would indicate that up to that time he had not orally or otherwise adopted plaintiff or promised to do so. If it were not for these documents this case would reflect a much different picture. The manner of reference to the Pattersons in the divorce petition could have been the notion of the attorney who drafted it.

■ It is true that this cause is in equity and that we are not bound by the finding of the chancellor below, but the rule is trite that it is our duty to give due deference to that finding.

In the Benjamin case, quoted supra, we said (338 Mo. 1. c. 1188, 93 S. W. (2d) 1. c. 981): "We might again call attention to the wisdom of the rule as to the character and quantum of proof required to support oral adoption, or to support adoption by estoppel, as it is sometimes termed. If this rule is relaxed, then couples, childless or not, will be reluctant to take into their homes orphan children, and for the welfare of such children, as well as for other reasons, the rule should be kept and observed. No one, after he or she has passed on, should be adjudged to have adopted a child unless the evidence is clear, cogent, and convincing so as to leave no reasonable doubt." And the rule should be no less strict as to a promise to adopt.

In view of this wholesome rule and giving that deference which is due to the finding below we are constrained to rule that the judgment should be affirmed, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.